## Robinson *v.* Floyd et al.     Appeal of Scott et al.

[Marked to be reported.]

*Partnership—Joint stock company at common law—Banks—Withdrawal of partner—Dissolution—Notice—Agreement—Liability.*

Notice of the dissolution of a partnership given in a newspaper, printed in the city or county where the partnership business is carried on, is of itself notice to all persons who have had no previous dealings with the partnership, so as to discharge a withdrawing partner from debts subsequently contracted; but, as to persons who have had previous dealings with the firm, personal notice must be given.

Where partnership articles provide that the capital of the firm shall be divided into shares, the business of banking to be conducted by a president and board of directors, and that the death or withdrawal of a member shall not work a dissolution of the partnership, such death or withdrawal does not work a dissolution of the partnership so as to discharge a withdrawing partner, who fails to give notice, from debts subsequently contracted in the name of the firm without his participation or assent.

*Statute of limitations—Partnership—Withdrawal of partner—Notice—Toll of statute—Liquidating partner.*

Where a partner withdraws from such partnership, and gives personal notice to the creditors, suit must be brought against the withdrawing partner within six years for a liability existing at the time of the withdrawal. The fact that interest was subsequently paid upon the debt by the partnership does not toll the statute of limitations as against the withdrawing partner. The power to toll the bar of the statute as to a copartner after dissolution belongs to a liquidating partner only, and there was none in the above partnership.

Argued Nov. 1, 1893. Appeals, Nos. 204, 205, 206, 207, 208, 209 and 210, Oct. T., 1893, by defendants, Graham Scott, H. J. Murdoch, C. F. Klopfer, Edward House and Wilson S. Arbuthnot et al., executors of Chas. S. Arbuthnot and J. S. Wallace, executor of Archibald Wallace, from judgment of C. P.

166   ROBINSON *v.* FLOYD et al.   SCOTT'S APPEAL.

Statement of Facts.                     [159 Pa.

No. 2, Allegheny Co., Oct. T., 1891, No. 385, making absolute rule for judgment for want of sufficient affidavit of defence in favor of plaintiff, Samuel Robinson.   Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ

Assumpsit for deposit in unincorporated bank.

In this action, brought Sept. 18, 1891, against William Floyd, Thomas Floyd, James W. Arrott, Charles Arbuthnot, C. L. Rose, James Bovard, Thomas M. Marshall, Graham Scott, H. J. Murdoch, Edward House, Joseph Walton, Archibald Wallace, Lewis Peterson, Jr., C. F. Klopfer, partners doing business under the name of the American Bank, plaintiff's statement averred: That defendants were partners, doing a banking business as bankers in the city of Pittsburgh, county aforesaid, under the name of the American Bank, at and during the time of the making of the deposits hereinafter set forth; that defendants became indebted to him for the sum of $21,000 as a depositor in the regular course of business, and they were and are now individually liable for said deposits; that the said bank suspended payment and closed its doors on Nov. 26, 1887; that he had not, at any time before the bank closed its doors, knowledge or notice that any of the above named defendants had withdrawn from the partnership; that a complete copy of the plaintiff's bank book, truly and correctly copied from the entries made in it by the defendants at the time they purport to have been made, is hereto attached and made part of this statement; that the plaintiff received a payment of $6,892.73 on Aug. 12, 1889, leaving a balance of $16,369.74 remaining, justly due and wholly unpaid; that the plaintiff now seeks to recover from the said defendants the said sum of $16,369.74 with interest from Aug. 12, 1889.

To this statement was appended copy of bank book and of articles of association, the latter quoted in the opinion of the Supreme Court.

The affidavit of defence filed by Graham Scott is stated substantially in the opinion of the Supreme Court.   The affidavit of Murdoch was similar in substance to that of Scott.   Arbuthnot, in addition, averred notice of withdrawal by publication in a newspaper, June 5, 7 and 8, 1875.   Klopfer averred "publication" of "due notice" of withdrawal.   House averred that

" affiant gave, as he verily believes, due and legal notice of the said sale and retirement."   Further averments of his affidavit are quoted in the dissenting opinion of Mr. Justice THOMPSON. Archibald Wallace averred personal notice to plaintiff of withdrawal.

Plaintiff entered a rule to show cause why judgment should not be entered for want of sufficient affidavits of defence, assigning therefor the following reasons, viz.:

(1) The defendants do not allege anywhere in their affidavits that the partnership was registered or incorporated, and all admit that they were partners during the time that the deposits sued for were made.   (2) All the defendants admit that the deposits of money sued for were made with them as bankers, by the plaintiff in the regular course of business, on a continuing contract.   (3) All defences set up by defendants have been disposed of and held insufficient to prevent judgment by the Supreme Court, at No. 38, Oct. T., 1892 [153 Pa. 84].

Judgment for plaintiff, in opinion by WHITE, J.

*Error assigned* was entry of judgment, quoting record as above.

*Jacob H. Miller,* of *Miller & McBride, J. M. Swearingen* and *J. S. Ferguson, Negley & Millar, Geo. E. Shaw* and *Geo. C. Wilson* with them, for appellants.—The death of the members ipso facto dissolved the partnership: Campbell v. Floyd, 153 Pa. 84 ; 3 Kent, p. 56 ; Crosskill v. Bower, 32 Beav. 86 ; Christy v. Sill, 131 Pa. 492.

The American Bank, of which appellants had been members, having been thus dissolved, the rights of appellee and the liabilities of appellants were then fixed and determined, if not before.   Of these dissolutions the appellee was bound to take notice.   The law presumes notice: Marlett v. Jackman, 3 Allen, 287.

If appellee had intended to look to appellants for his money he was obliged to prosecute his action within six years from that time:  Wilson v. Waugh, 101 Pa. 233; McKelvy's Ap., 72 Pa. 409.

Surviving partners have no power to bind their late partners by a promise which tolls the statute of limitation : Wilson v.

168    ROBINSON *v.* FLOYD et al.    SCOTT'S APPEAL.

Arguments.                                    [159 Pa.

Waugh, 101 Pa. 233; Reppert v. Colvin, 48 Pa. 248; McCowin v. Cubbison, 72 Pa. 358.

The appointment of a liquidating partner is a question of fact and is not a presumption of law: Fulton v. Bank, 92 Pa. 112; Lloyd v. Thomas, 79 Pa. 68; Seigfried v. Ludwig, 102 Pa. 547; Wilson v. Waugh, 101 Pa. 233; Searight v. Craighead, 1 P. & W. 135.

When the dissolution of a partnership is by operation of law, such as death or bankruptcy, there can be no liquidator; and much less can there be a presumption of appointment. The American Bank was dissolved by the death of John Floyd, and the statute of limitations then began to run in favor of appellants and John Floyd. It has run unless a distinct unqualified promise has been made by appellants in the meantime. This appellants expressly deny. The reply to appellants' denial is unavailing, because no one had authority to bind them by a promise, express or implied.

In cases of this sort, if the arrangement is made known to a creditor and he assents to it, and, by his subsequent act or conduct or binding contract, he agrees to consider the remaining partners as his exclusive debtors, he may lose all right and claim against the retiring partner, especially if the retiring partner will sustain a prejudice and the creditor will receive a benefit from such act, conduct or contract: Story, Part. § 158; Cummins v. Cummins, 8 Ir. Eq. 723; Harris v. Lindsay, 4 Wash. (U. S.) 271; Lindley, Part. 239; Parsons v. Tillman, 95 Ind. 452; Bacon v. Daniel, 37 Ohio, 279; Barringer v. Warden, 12 Cal. 311; Delp v. Brewing Co., 123 Pa. 42; Williams v. Little, 35 Vt. 323; Ainslie v. Boynton, 2 Barb. 258; Woodward v. Miles, 24 N. A. 289; Kountz v. Holthouse, 85 Pa. 235.

A party may sue on a promise made for a sufficient consideration for his use and benefit, though it be made to another and not to himself: Merriman v. Moore, 90 Pa. 78. The statute of frauds is no defence to such an action: Dock v. Boyd, 93 Pa. 92.

*G. A. Jenks, C. P. Robinson* with him, for appellee.—When an ostensible or known member of a copartnership retires therefrom, and wishes to shield himself from liability for future

ROBINSON *v.* FLOYD et al. SCOTT'S APPEAL. 169

1893.]                    Arguments.

debts of the firm, it is necessary that personal notice of his withdrawal be given to all who have had dealings with the firm, and that notice be given, by publication or otherwise, to all others : Watkinson v. Bank, 4 Whart. 482.

Where one partner sells out to others, the funds become primarily liable to the claims of the creditors of the new firm : 2 Bouvier's Law Dic. 374; Baker's Ap., 21 Pa. 76; Christy v. Sill, 131 Pa. 493.

Interest was paid on this balance by the liquidating partners at the expiration of each six months, until Oct. 1, 1887. This payment of the interest by the liquidating partners tolled the running of the statute of limitations : Campbell v. Floyd, 153 Pa. 84; Davis's Est., 5 Whart. 530; Houser v. Irvine, 3 W. & S. 345; Dundass v. Gallagher, 4 Pa. 205; Brown v. Clark, 14 Pa. 474; Kauffman v. Fisher, 3 Grant, 302.

As the deposits made with the new firm and the checks drawn on the new firm were equal in amount, after the death of John Floyd, none of such checks could be applied to the payment of the debts of the old firm, for such old firm had ceased to do business as bankers, as each of the members of the old firm retired, and the money paid, except the semiannual interest, was paid out of the assets of the new firm : Christy v. Sill, 131 Pa. 492; Doner v. Stauffel, 1 P. & W. 198; Snodgrass's Ap., 13 Pa. 471; Baker's Ap., 21 Pa. 76; York Co. Bank's Ap., 32 Pa. 446; Frow's Est., 73 Pa. 459; Clark v. Wilson, 19 Pa. 414; Bullitt v. M. E. Church, 26 Pa. 110; Clark's Ap., 107 Pa. 436; Scull's Ap., 115 Pa. 148.

Where no application of payment is made at the time of payment, the law applies it to the debt which is least secured, and in the way most beneficial to the creditor : Borland v. Murphy, 92 Pa. 91; Shenk's Ap., 33 Pa. 371; Taylor's Ap., 81 Pa. 460.

As all of the assets of the partnership of which John Floyd was a member passed into the possession and were subject to the control of the officers of the American Bank, who were also partners, and those assets were used and applied by them, if consent to act as liquidating partners was necessary, that assent would be presumed from their so continuing to act from the time of his death to the closing of the bank, without objection from any of the partners : Campbell v. Floyd, 153 Pa. 84; Fulton v. C. Bank, 92 Pa. 112.

170   ROBINSON *v.* FLOYD et al.   SCOTT'S APPEAL.

Arguments—Opinion of the Court.          [159 Pa.
The position that defendants were discharged, by reason of a novation after the death of John Floyd, has been ruled against appellants: Robinson v. Floyd, 153 Pa. 98.

OPINION BY MR. JUSTICE DEAN, December 30, 1893:

The American Bank was a partnership, of which appellants were members, organized April 6, 1869, in a banking and brokerage business in Pittsburgh, Pa. The capital, by the partnership articles, was $200,000, divided into 2000 shares of $100 each. This was all paid up, and certificates, of the amounts subscribed and paid by each partner, delivered. The business was transacted by a president, cashier, and a board of directors, who were elected annually. While the methods and forms of business adopted were those of a joint stock company or a corporation aggregate, still the members, notwithstanding this, were well aware of their responsibilities as partners, as is shown by the first of the written special stipulations of their partnership articles, which is as follows:

" And whereas, the stockholders will be individually bound for all liabilities of the company, and are therefore deeply interested in the character, credit and responsibility of each other, it is especially agreed upon that no person or persons under a legal disability or restriction of personal responsibility, such as married or single women, minors, and those acting in a representative capacity, shall be eligible to hold stock or to become or remain members of said company, nor shall any one not fully pecuniarily responsible, be eligible to become a member, or, being a member, to remain so."

John Floyd was the first president, and was continued in the office until his death, Oct. 2, 1881; then another president, William Floyd, was appointed to the vacancy, and the bank continued business without interruption down to November 25, 1887, when, because of insolvency, it went into the hands of a receiver.

Of these appellants, Graham Scott, 10 shares, C. F. Klopfer, 30 shares, C. Arbuthnot, 50 shares, Archibald Wallace, 50 shares, were original subscribers to the articles of association. Edward House and H. J. Murdoch apparently acquired their shares after the bank had commenced business, for their names do not appear among the original subscribers. Scott

ROBINSON *v.* FLOYD et al. SCOTT'S APPEAL. 171!

1893.]                    Opinion of the Court.

sold his shares to John Floyd, the president, November 6, 1878 ;·
Klopfer sold his to John I. House, February 16, 1876 ; Arbuth-
not, his to J. H. Sewell, June 4, 1875. Wallace first sold 20'
of his to John Shipton, then the remaining 30 to John Floyd,·
August 30, 1879. House sold his to John I. House on Septem--
ber 19, 1879. Murdoch sold his in 1880 to President Floyd.
Each of them, after the sale, ceased all connection with the·
business of the bank as partners.

As has been noticed, the president, John Floyd, probably the·
owner of the largest interest in the bank, subscribing first for·
250 shares and afterwards purchasing others, died October 2,·
1881 ; others of the original subscribers had died before him.·
John I. House died January 8, 1879.

Samuel M. Robinson, the appellee, commenced depositing·
in the bank September 15, 1870, and continued depositing and·
checking out until the bank failed in November, 1887. By an·
agreement he first was to receive six per cent interest on all·
deposits left for six months ; this continued until June, 1875,·
when the rate was reduced to five per cent ; this ran until
April 1, 1877, when the rate of interest was reduced to three·
per cent, and so continued to the end. The interest at the·
rates agreed upon was regularly paid him every six months up·
to the date of the failure of the bank, when his balance was·
$21,000. He had drawn out by check after the sale by Arbuth-
not and Klopfer of their shares,$12,441.45; the receiver has paid
him in distribution of the assets $6,892.73. After the sale by
Wallace of his shares, Robinson deposited $5,530. On Septem-
ber 18, 1891, almost four years after the insolvency of the bank,
the appellee brought suit against these appellants and those join-
ed with them as partners for the recovery of the balance yet un-
paid, $16,369.74.

As will be noticed, in the suit brought in the common pleas,
there are fourteen defendants ; judgment for want of a suffi-
cient affidavit of defence was entered against all of them ; but
only six, Scott, Murdoch, Klopfer, Arbuthnot, Wallace and
House, prosecute this appeal. The facts tending to create lia-
bility as partners are not precisely the same as to all of de-
fendants.

The affidavit of defence by Scott admits : (1) The forma-
tion of the partnership, the subscription and payment of the

172    ROBINSON *v.* FLOYD et al.  SCOTT'S APPEAL.

Opinion of the Court.                              [159 Pa.

capital, and his membership interest to the amount of ten shares. (2) Avers that he sold his stock by and with the consent of the president and directors, November 6, 1878, that the same was transferred on the books of the company, and thereafter his connection with the bank as a partner wholly ceased. (3) That during his connection with the bank he had not held any office therein, and had no share in the management of its business. (4) That he had no acquaintance with Robinson, the plaintiff, nor any knowledge that he was a depositor. (5) That after plaintiff had made deposits, and after deponent ceased to be a member of the firm, several of the partners, at different dates, died, which deaths worked a dissolution of partnership; that this was well known to plaintiff, yet he permitted settlements and distribution of the decedents' estates without presentation of his demand, and now, nine years having elapsed since the deaths aforesaid, he and the other surviving partners have suffered irreparable damage. (6) That by reason of plaintiff's laches he is now estopped from maintaining his action, and further, not having brought suit within six years from the time his right of action accrued, he is barred by the statute of limitations. In these particulars the other affidavits set up in substance the same defence. Arbuthnot, Klopfer and House, however, further allege they gave notice of their withdrawal, at or about the time of it, by publication in Pittsburgh newspapers. Wallace alleges he gave personal notice of his withdrawal to this plaintiff within three months of the sale of his stock, August 30, 1879.

Taking the averments in these affidavits, and those not denied in plaintiff's statement, to be the truth, the "American Bank" was, so far as concerned creditors, nothing but a partnership composed of many individuals, among them these appellants. From time to time, some of them sold their stock and withdrew; at the time of the withdrawal of these appellants, and for years before, this plaintiff was a depositor; the partnership, when they retired, owed to him a large amount of money: he could at that time, and within six years thereafter, without question, have maintained this action for the indebtedness then existing. But, by subsequent deposits, the debt increased. What is their liability with reference to this increase? If plaintiff's contract relations with the bank had commenced

after they had ceased to be members of the partnership and they had given notice of their withdrawal, they are not answerable for the subsequent indebtedness of the partnership; and publication in the newspapers of their withdrawal would have been sufficient notice to him.   In Watkinson v. The Bank of Pennsylvania, 4 Wharton, 482, it is said : " The question presents itself in this case, what is sufficient notice of the dissolution of a partnership, so as to discharge a partner from debts subsequently contracted in the name of the firm without his participation or assent ?   The rule seems to be that notice of the dissolution of the partnership given in a newspaper, printed in the city or county where the partnership business is carried on, is of itself notice to all persons who have had no previous dealings with the partnership.   But as to persons who have had such previous dealing with the partnership, it is not sufficient." In the fifty years that have passed since that decision, that rule has been invariably applied in this class of cases.   So, as to the averments of Scott, Klopfer and House of notice by publication in the newspaper, it cannot avail as a defence here against subsequent partnership indebtedness, for this plaintiff had been a depositor from almost the organization of the bank.   As to Wallace, who alleges he gave actual personal notice to the plaintiff of his withdrawal, within three months after August 30, 1879, if that be established by proper proof, his liability for any increase of indebtedness after that date was gone.   We cannot ascertain from the statement of claim and admissions in the affidavit what was the exact indebtedness at that time. Appellee's counsel, in his argument, undertakes to establish, from the copies of books and other evidence, that there was no substantial change after that in the total of the indebtedness; that although plaintiff made deposits afterwards the checks paid about equalled the amount of such deposits and must be charged against them, thus leaving the debt about the same as when Wallace withdrew.   If it be the fact that there was, by the subsequent dealings, no change in the amount of the indebtedness, then the fact of payments having been made on Robinson's checks would not lessen Wallace's liability when he withdrew.   The new indebtedness having been incurred by the partnership when Wallace was not a member of it, payments made covering the same period would be applied in discharge

474   ROBINSON *v.* FLOYD et al.   SCOTT'S APPEAL.

Opinion of the Court.                    [159 Pa.

of such new indebtedness.   Christy v. Sill, 131 Pa. 492, and the authorities therein cited, we think clearly rule this point in favor of plaintiff.   Whether the indebtedness continued the same, is a question of fact incapable of certain determination from this record; the inferences drawn in the argument by counsel for appellee may be correct; we cannot say, however, they are indisputably warranted from the averments in plaintiff's statement, and the admissions and averments in the Wallace affidavit.   But, in the view we take of this case, if there was actual notice, and defendant persists in his plea of the statute of limitations, this question is immaterial; the case must go to the jury on the question of actual notice, and this without regard to the plea of the statute.   If, then, the jury should find the fact of actual notice, the statute would avail, so far as concerns Wallace, to defeat a recovery; if they should find there was not actual notice, Wallace's case would stand on no better ground than the others.

The question of actual notice was not present in the case of Campbell v. Floyd and others, 153 Pa. 84, and the cases argued with and ruled by that opinion, all of which arose out of this same partnership.

Wallace swears that when he sold his stock he gave actual personal notice of the fact to this plaintiff, and thereafter had no further connection with the bank, and no one was authorized to act for him with respect to this business.   In his denial of authority to the remaining partners to act for him, he is corroborated by the agreement or articles of copartnership.   His withdrawal did not effect the dissolution of the partnership, with all the legal consequences which generally follow such an event in business partnerships.   It was not a cessation of business and dissolution by consent of all the members, or a dissolution by the expiration of the term fixed in the articles, or a dissolution such as finally did take place when the receiver was appointed; in either of these cases, active management is continued beyond the date of dissolution, only for one purpose, winding up the business, that is, realizing on assets, the collection of debts due the partnership, and the payment of debts owing by it.   It was not intended the withdrawal or death of a member should operate as a dissolution in fact; so far as they could, by agreement, give it a perpetual existence, that was intended.   Notice

these stipulations in the articles: " The company reserves the right for any cause whatever to dissolve its connection with any one or more of its members by a resolution of the board to that effect; and no member or members, short of a majority of the votes at a meeting called for that purpose, shall have power to dissolve the company, or cause a dissolution or winding up of its affairs."

Then follow most minute details of a method of compensating any party who wishes to sell his stock and withdraw, or who has been " exscinded " from membership, and then this stipulation: " And it is distinctly understood and fully agreed upon that no party or parties shall be able to effect a dissolution of the company by any proceedings at law or equity, but the mode or manner of any change in the parties or their interests shall be accomplished as hereinbefore provided; " that is, by a majority of the members at a meeting called for that purpose. Then it was provided, in case of the death of a stockholder, his heir or legal representative, with the consent of the board, could become a member.

As between themselves, by their agreement, there could be no dissolution, in the usual sense of that term, except by a majority vote at a meeting called for that purpose; the partnership never was to cease business and be wound up in any other way. As the agreement expresses it, a partner might, by resolution of the board, be " exscinded," that is, cut off, or he might, by consent of the partnership, dispose of his interest and withdraw, or he might die, but in neither case was this to affect the continued life of the partnership. Therefore, the distinction which the law makes between the powers of liquidating partners and surviving partners, only to a limited extent, is applicable here, for the remaining partners were to immediately settle up nothing with any of the creditors; otherwise, the payment of depositors would have closed the bank every time a member sold out his interest or died. In fact, under the agreement, although the financial responsibility of the partnership could be changed, the withdrawal of a member in no way impaired its paid-up capital; he did not draw his share of this out of the bank when he sold; he got his money from the buyer who took his place as a member of the partnership. Assuming, then, as a fact, which is disputed by plaintiff, that Wallace gave him

176 ROBINSON *v.* FLOYD et al. SCOTT'S APPEAL.

Opinion of the Court. [159 Pa.

personal notice that he had sold out and withdrawn, what knowledge is necessarily to be imputed to Robinson from the fact of notice? It is not disputed by appellee that Robinson, from that time, knew he could make no assertion of liability against Wallace for subsequent deposits; and for the exisiting liability his demand must be preferred within six years, unless the statute was tolled. This suit was not brought for more than nine years after the right of action accrued, and the statute is pleaded in the affidavit. To this plaintiff replies, interest was paid afterwards on the balance every six months by the partnership, and this tolled the statute of limitation. But then plaintiff is met by this fact: As between the partners, by their articles, if one withdrew by a sale of his interest there was no authority, either express or implied, to the remaining partners to make any promise or any payment equivalent to a promise to a creditor. He, the partner, had no further interest in the assets or business of the company; he could not call on them to account, nor they on him for contribution.

Robinson knew when he commenced his deposits the bank was a partnership; prior to the notice, Wallace's liability depended on the fact of his being a partner, and not on Robinson's knowledge of the fact; but, when he got the notice, he knew as a fact Wallace had been one, had sold out and was no longer a partner; he knew, too, that there was no dissolution in fact, but only a severance of Wallace's connection as a member; he knew the bank continued on in business for years afterwards, for he continued to do business with it just as before, with no change in the accounts and no indication of a desire on the part of either depositor or bank to settle up and pay the old accounts, or to transfer them to a new partnership. He knew, as well as the bank did, it was not liquidating accounts; he probably would not have permitted his money to remain for years with the liquidating partners of a dissolved partnership, nor have deposited more money with them. If he was notified by Wallace of the sale of his interest, the necessary reasonable inference is, he knew Wallace had no further interest in the old assets any more than in the new business; that he would confer on his copartners no authority to acknowledge and promise to pay an old debt, for, as between the partners, he owed none. He knew from the notice that from

that time Wallace disclaimed all liability for either old debts or new ones; if he intended then to stand on his legal right as against Wallace, he should by legal method, by suit within six years, have enforced it.

On the exceptional facts presented in this case, it seems to us the conclusion must follow, if the notice were given, that the plaintiff knew there was no authority in the remaining partners to toll the statute, and as he brought no suit within the six years, as against Wallace he cannot recover.

As to the other five appellants, three of them allege they gave notice by publication of the sale of their respective interests. As already seen, such notice was not sufficient to relieve them from liability. As to the two others, notice of any kind is not alleged. But, as to all of them, it is alleged that the deaths of John Floyd, October 22, 1881, and of others, worked a dissolution of the partnership by operation of law; that death, ipso facto, dissolved the partnership.

It may be conceded, this worked a change in the partnership, so far as concerned its personality, and the law presumes notice of the fact of death to plaintiff; but this, in the face of this agreement, in no way affected the liability of the surviving members, for, by their agreement, it was not to affect the partnership; and as to existing creditors, without notice, all were surviving or continuing partners, without regard to the fact of withdrawal. Death, the law presumes equivalent to actual notice; thereafter the creditor could not hold the deceased partner's estate answerable for new indebtedness, nor, except within the statutory period, for the old; but these appellants neither died nor gave actual notice of the severance of their relations with the partnership; nor was presumptive notice to the creditor of the severance of one partner's connection by death any notice to him that some of the living ones had withdrawn; as between them and this creditor they continued to be partners, and are therefore answerable for all business transactions of the firm during their actual and presumptive membership.

The questions here raised by appellants and now decided were not directly passed on in Campbell v. Floyd, supra, because they were not necessary to a decision of the cause. There was no positive averment of actual personal notice to the cred-

178   ROBINSON *v.* FLOYD et al.   SCOTT'S APPEAL.

Opinion of the Court.                    [159 Pa.

itor by the retiring partner of the sale of his partnership interest;
nor was the dispute between the representatives of a deceased
partner and a creditor, in which case, notice of the severance
of the deceased partner's connection with the firm would have
been presumed.   As to those retiring without notice, they were
held, as to past indebtedness, to be sureties for the partnership,
which assumed payment of the common obligation.   This was
the most favorable view which could have been taken of the
case for defendants, on the facts in that issue, and, in that view,
the decision was against them.   That judgment was right, but
it seems to us, a more clearly defined ground, sustained by a
long line of well considered decisions from Watkinson v. Penna.
Bank, supra, down to Clark v. Fletcher, 96 Pa. 416, is that
upon which we base the present judgment.

The argument of the learned counsel for appellants, as to the
intolerable hardship to retiring partners in holding them up to
such a measure of liability, and that no partner, under such a
rule, can retire with safety without a cessation of, and a com-
plete winding up of the business, we have fully considered.   It
does not seem to us that the inference of hardship is warrant-
ed by the facts in this case, or by the law applicable to the
facts.   In partnerships other than banking, it has always been
understood that, in case of a retiring partner with the assump-
tion of existing indebtedness by the new firm, actual notice
must be given to all creditors of the old firm of the change, if
the retiring partner wishes to clear himself of continued liabil-
ity.   The perils attending a banking copartnership such as this,
may be, doubtless are, greater than in other kinds of business ;
there is probably more risk incident to the care of other peo-
ple's money than of one's own, but this is no reason for relax-
ing well-established rules of law for the protection of the public.
In the case before us, a copartnership was formed by many in-
dividuals for profit; in the minds of a large part of the public,
a voluntary banking partnership with individual responsibility
is safer than one where the members are associated as a corpo-
ration ; not seldom the partnership holds out to the public, as
an inducement to favor, this individual liability.   On the faith
of it, the depositor intrusts the partnership with his money ; he
does this, not only on the faith of the paid-up capital, but also,
it may be assumed, on the good character, business capacity

ROBINSON v. FLOYD et al. SCOTT'S APPEAL. 179

1893.]        Opinion of the Court—Dissenting Opinion.

and individual wealth, of the copartners; he has all these as security for the repayment of his money. It may be considerable inconvenience to the retiring partner, but it is certainly no great hardship, to hold that he shall give actual notice of withdrawal to all who have trusted the partnership because of his connection with it, otherwise he shall remain answerable to those who have a right to believe him still a member. On such notice of withdrawal, the creditor, if he sees proper, can also withdraw; if the partners do not give such notice, then, as he was there when confidence was reposed, he must be there when the money is wanted by the creditor. For those who desire to do a banking business, which invites the custody of other people's money, yet do not wish to subject themselves to a greater responsibility than equals their contribution to the paid-up capital, the corporation laws of the United States and of this commonwealth furnish every facility.

The judgment as to Archibald Wallace is reversed, one sixth the costs to abide the event, and as to him a procedendo is awarded; as to the other appellants, the judgment is affirmed.

DISSENTING OPINION BY MR. JUSTICE THOMPSON, December 30, 1893:

The appellants in their affidavits of defence invoke the protection of the statute of limitations. The dormant nature and character of the demand fully warranted them in seeking to secure from it the repose contemplated by the statute. This suit was brought by appellee against appellants, as partners doing business as the American Bank, for the recovery of money received by the bank from time to time, commencing in 1870, and upon which interest, first at six per cent, subsequently at five per cent and finally at three per cent, was paid. The partnership, organized to conduct a banking and brokerage business, was formed by articles of association in which it was provided that shares of stock were to be issued, each share to be entitled to one vote, that transfers of shares were to be made with the consent of the board of directors and that withdrawals were to be permitted upon valuation. From the character of the partnership each sale of stock, and the transfer of the same to the vendee with the consent of the board of directors, practically operated to create in each instance a new partnership. The new firm with its new members thus created became liable for

its debts while the old firm continued liable for its indebtedness. The death of a member dissolved the partnership, and, upon such dissolution, although some of the partners then created a new partnership to carry on the business, the members of the old firm were liable only for the existing debts of such firm and not for those of the new firm. Appellants who had been shareholders sold their shares upon the following dates and to the following persons, viz..: Charles Arbuthnot, 50 shares to J. H. Sewell, a stockholder, June 4, 1875; C. F. Klopfer, 30 shares to John I. House, a stockholder, February 16, 1876; Edward House to John I. House, September 19, 1876; Archibald Wallace, 20 shares to John Floyd, president and stockholder, August 30, 1879; Graham Scott, 10 shares to said John Floyd, November 6, 1878; H. J. Murdoch, 10 shares to said John Floyd in 1880. Thus at these respective dates these appellants severed their partnership relations and their vendees became the new partners. John Floyd, the largest stockholder, died October 2, 1881. In 1887 the bank became insolvent, and in 1891 this suit was brought. The death of John Floyd in 1881 dissolved the partnership, and its members became then liable for its debts. That was the punctum temporis when the statute of limitations began to run. After it thus began to run a partner could not by a promise take the claim out of the statute. By the dissolution the authority to do so ceased.

Even conceding that those withdrawing had not relieved themselves as to existing customers of the bank by a proper notice, yet the death of Floyd caused a dissolution, and certainly, as to those who had previously withdrawn, the statute then began to run, for they never became partners in the new firm that continued the business of the old.

In Reppert v. Colvin, 48 Pa. 252, it is said by Mr. Justice READ: " The law is well settled that, after dissolution of a partnership, the partners cease to have any power to make a contract in any way binding on each other. The dissolution puts an end to the authority, and operates as a revocation of all power to create new contracts. Of course a new promise, of which the original debt is only the consideration by a partner after the dissolution of the copartnership, will not take the debt out of the statute of limitations so as to make the copartners liable."

It will be conceded that the statute bar can only be removed by one who has authority to do so, and that when a partner is authorized to liquidate he is clothed with such authority.   A partner who takes the assets of his firm for the purpose of liquidating may without doubt make an acknowledgment or an express promise which would take a debt out of the statute. This springs from the duty he has assumed with regard to the assets and their application to the payment of the debts of the firm.   In Wilson v. Waugh, 101 Pa. 237, it is said by Mr. Justice Green : " In Levy v. Cadett, 17 S. & R. 126, and in many cases since, it was held that, after dissolution of a partnership, one partner cannot, by his acknowledgment, revive a partnership debt so as to deprive the other partner of the benefit of the act of limitations.   It is also true, however, that this rule is subject to the exception that one who is a liquidating partner may, after dissolution, bind his former partner by either an acknowledgment, or an express promise to pay, so as to take the debt out of the statute."

When therefore the death of John Floyd caused a dissolution of the firm, unless the surviving partners were made liquidating partners, the statute bar continued.   While the appointment of a liquidating partner need not be express or specific it may be inferred from acts done in liquidation with the consent or the knowledge of the former members.   The authority to act as liquidating partner must however spring from express authorization or an implied assent.   When so established its purpose is to wind up the affairs of the firm.   In the present case there is nothing to warrant the conclusion that the appellants had any knowledge of or in any manner assented to the appointment of any liquidating partners.   When John Floyd died in 1881, three of the appellants, for a period exceeding five years, had ceased to have any connection with the partnership and had given notice by publication of their withdrawal, and one for a period of two years who had given appellee personal notice of his withdrawal, and the others for over one year.   They have not in any manner or form directly or indirectly given any authority to their former partners to act as liquidating partners, and have not expressly or impliedly assented to any liquidation by them.   When he died liquidation of the dissolved firm was not undertaken.   While he had a large estate,

182 ROBINSON *v.* FLOYD et al. SCOTT'S APPEAL.

Dissenting Opinion. [159 Pa

amounting to $250,000, which has been since distributed, no suggestion appears to have been made in regard to any liquidation. The firm succeeding that dissolved by the death of Floyd carried on the banking and brokerage business, and in no manner acted as liquidating partners of the dissolved firm. Whatever liability may have existed in regard to appellee's claim against the old firm, instead of a liquidation there was as to the succeeding firm a clear and distinct novation.

The articles of agreement so far from changing the law of the case only make it more emphatic. The agreement is meant to prevent liquidation and provide for a continuance of the business without a break, so far as customers are concerned. As to the rights of the partners inter se, it binds them, so far as an agreement can, not to bring about a dissolution except in the way specified, but it has no such provision as to death. In such event the agreement says, "'The heir or legal representative' may by consent of the board become a member." Without such consent he is not a member, and with it he becomes by virtue of it only a member not of the old firm but of the new. It is manifest that the appellee so understood it, because he received interest from such new firm and claimed a dividend from the proceeds of its assets. One of the affidavits of defence avers a novation, for it states: "That not only did the plaintiff continue to transact business with this bank for a period of eleven years after said affiant had sold all his interest therein, but, as your affiant is advised and believes and expects to be able to prove on the trial of this case, he did this with a full knowledge of the fact that this affiant had sold and transferred in said bank as hereinbefore stated, and after having said knowledge the said plaintiff agreed to leave his money with the new partnership and to receive interest thereon at the rate of three per cent per annum for the use by the new partnership of the said money, and that the said new partnership actually paid to the plaintiff at various times and dates after September 19, 1876, for the use by said new partnership of said money, interest at the rate of three per centum per annum, and even down as late as October, 1887, the plaintiff continued his loan of said money to the new partnership, upon the same terms, and at the same rate of interest as he had loaned the money at and after September 19, 1876, to the said new partnership." The fact that

the firm, composed of persons who had been members of the old firm, might eventually pay this indebtedness, is no foundation for the conclusion that the partners in such firm were acting in regard to it as liquidating partners of the old firm.   They were not appointed as such, and their action as liquidating partners in regard to this indebtedness was not known or assented to.   The members of the new firm themselves it seems had no knowledge of it, and it is without question that the other alleged partners of the old firm (the appellants) never had any knowledge or suspicion of it.   If they did not assent to the appointment of liquidating partners, clearly as to them none were appointed, and therefore there was no authority to remove the statute bar.   Statutes of limitation are statutes of repose, and, while there may exist a natural prejudice against a resort to them, they are justly regarded as wise laws intended to defeat dormant and stale demands which time has stamped with suspicion and doubt.   They impose no hardships because they exact a moderate degree of diligence in the enforcement of just and legal claims.   The claim in the present case properly comes within their intendment.   For several years prior to 1881 appellants ceased to be partners, and in that year the partnership itself was dissolved.   No liquidation took place and no claim was made against the estate of John Floyd, who was the owner of one half of the stock, and none made against appellants until 1891, ten years after the dissolution, and from eleven to sixteen years after they had ceased to be partners.   Appellee in the meantime received interest from the new firm up to 1887, the date of its failure, and doubtless was in utter ignorance of any claim against them.   The claim in my opinion has no substantial merit to support it and the statute should bar a recovery, because, in the absence of liquidation, the partners could not remove that bar, and because the affidavits of defence contain sufficient averments denying the appointment of liquidating partners with power to do so, and their appointment is thus a question of fact which should be sent to a jury and be determined by it.

I am therefore of the opinion that this judgment should be reversed and a procedendo awarded.

Mr. Justice Mitchell concurred in this dissent.